Alfred **ALFSON** and Ella Alfson, Plaintiffs
and Appellants,

v.

F. R. **ANDERSON**, and all other persons un-
known claiming any estate or interest in,
or lien or encumbrance upon, the property
described in the complaint in this action,
Defendants and Respondents.

No. 7606.

Supreme Court of North Dakota.

Sept. 28, 1956.

Cox, Pearce & Engebretson, Bismarck, for plaintiffs and appellants.

Burk & O'Connell, Williston, for defendants and respondents.

NORRIS, Judge.

This is an action to quiet title to some 1,960 acres of land in Williams County. The complaint is substantially in statutory form. Section 32–1704, NDRC 1943. The defendant F. R. Anderson by way of answer and counterclaim denies the material allegations of the complaint and alleges that in consideration of one dollar paid to them and in further consideration of the mutual execution of an option for a commercial oil and gas lease covering all of the land described in their complaint, the plaintiffs did on the 11th day of June, 1951, execute an option for an oil and gas lease, a copy of which is attached to and made a part of the counterclaim. The defendant Anderson further alleges that he exercised his option within the time and in the manner provided therein and that the plaintiffs have refused to comply, although the defendant Anderson has at all times been ready and willing to accept the lease and comply with the conditions of the agreement which he describes as an option. He asks the court to require the plaintiffs to specifically perform the agreement. The plaintiffs replied, denying the material allegations of the answer and counterclaim and specifically denying that any option was ever executed by the plaintiffs.

This is one of fourteen actions to quiet title involving similar agreements. These actions were tried together, although they are brought by different plaintiffs. This appeal, however, only involves the plaintiff Alfred Alfson and Ella Alfson, his wife. The case was tried to the court without a jury who found in favor of the defendant F. R. Anderson on his counterclaim and decreed specific performance of the instrument known as an option contract with respect to the land owned by Alfred Alfson but excluding from the decree a one-half interest owned by Ella Alfson in 480 acres and a one-half interest in oil and gas rights owned by the State of North Dakota in another 640 acres. The plaintiffs appeal and demand a trial de novo.

The appeal as presented to us involves questions of fact and law arising out of the execution and the effect of an instrument in writing at the top of which appears the title "Option to Lease For Oil and Gas." It covers about a sheet and a half of legal size paper. On the lower half of the second sheet are seven signatures. Attached to the instrument are four other sheets of paper bearing the purported signatures of approximately 65 persons. Opposite each signature is the word "owning" followed by a description of real property in general terms. On the third signature sheet appears the signature of Alfred Alfson and opposite the word "owning" is this description: "app. 1960 acres in 154/102 (In Judson Twp)." Underneath his signature in parentheses appears the notation: "Ella Alfson, his wife." It is not contended that this is her signature. Also attached to the instrument are four forms of "Oil And Gas Lease" which are identical in terms but vary with respect to the location of land in that they name different townships. These leases are not completed and contain neither the names of lessors nor specific descriptions of land.

The issues of fact arise both with respect to consideration for and the intent with which Alfson placed his signature upon the sheet attached to the instrument. The evidence is conflicting as to whether the stated consideration of $1 was ever paid. Alfson contends that he was fraudulently induced to sign the instrument in that he was told that he was merely listing his property as being available for lease and that the signature page was with other sheets of paper on a clipboard and was not attached to the instrument designated as an option to lease for oil and gas. The trial court found against him on the facts and decreed specific performance as to the oil and gas rights owned by Alfred Alfson in Judson Township.

The first and primary issue of fact is whether the plaintiff Alfred Alfson signed the agreement referred to as an option knowing that he was making a binding offer to give Anderson an oil and gas lease upon his property as provided by the option or whether, as he testifies and contends, he signed his name on a sheet of paper below some other signatures because Anderson "just wanted my name and the amount of acres I had and he wanted to know if they assembled this block if I would lease." and that it was necessary to put down his name to verify the truth that he had 1,960 acres of land. Alfson also testifies that Anderson's agent who procured his signature "mentioned they were leasing land. He talked like they were trying to assemble a block of land to lease."

It appears that Anderson was attempting to assemble a block or blocks of oil and gas leases in nine townships in Williams County. To facilitate this operation he held various meetings which were attended by groups of interested landowners and at which he or his representatives explained the purpose of the operation that Anderson was conducting and secured signatures of landowners to option agreements similar to the one involved in this case. The first of these meetings was held June 11, 1951, at Corky's Cafe in Williston and was attended by about fifteen landowners of that area. Alfson was not present. At that time most, if not all, of those present signed the same agreement that was later signed by Alfson. Other pages and other signatures were added. These pages contain only names and property descriptions. In all there appear to be thirty signatures before that of Alfson; while forty-two appear to have signed it afterward.

Mr. Joe Brownrigg testified that he was employed by Mr. Anderson in the summer of 1951 and after the meeting in Corky's Cafe he was told that Mr. Alfson had approximately 2,000 acres in Judson Township that he wanted to lease. Judson Township was outside of the nine township area that was being covered in obtaining option agreements. Mr. Alfson was in the grain buying business in Williston. Brownrigg went to his office with the option agreement stapled together and on which was the first typewritten page. Brownrigg told Alfson that Mr. Anderson had asked him to come to see him and that Brownrigg understood he was favorable to entering into an option to lease his land in Judson Township. He read the option to Alfson, explained the different provisions of it, and showed him the signatures that had already been obtained. Alfson signed it and Brownrigg gave him $1.

James Alfson, a son and employee of the plaintiff Alfred Alfson, testified that he was present in his father's office when Mr. Brownrigg came in and remained until after his father had signed a piece of paper that looked like the fourth page of the agreement. Brownrigg did not ask his father to give an option to take an oil and gas lease. Nor did Brownrigg show his father any printed form of oil and gas lease. The witness did not see any pages of the agreement containing typewriting and did not see Brownrigg give his father any money. Brownrigg did not speak of leases but talked of assembling acres. "* * * it was primarily just to see how many acres they could assemble at that time."

In view of plaintiff Alfson's insistence that at the time he signed the paper in his office he did not understand that he was signing an offer or option to lease his land for gas and oil, the testimony of the witness L. C. Hart is significant. He was present at the meeting at Corky's Cafe on June 11 and he was the second signer of the option agreement which he later carried out by executing a lease. Anderson and Brownrigg were present at the meeting. Anderson explained his project of securing blocks of acreage in detail. Those present examined the proposed option agreement. After some discussion the leases attached to it were in part redrafted and the landowners present, about fifteen in number, affixed their signatures. At that time the document was assembled and the lease forms were all attached. The next morning Hart met Alfson on the street and they talked about oil leases. Hart testified:

"I was rather enthused about the meeting of the night before and I imparted those facts what we went into. As I recall, Mr. Alfson said, 'Hart, we have always been good friends, why didn't you let me in on that meeting?'"

Hart then told Alfson that he did not know whether Alfson could get into the same block of leases but that they would find out. Here it should be noted that the lease forms attached to the agreement did not include Judson Township in which Alfson's land was located. The two men then crossed the street to the office of Anderson's attorney where Hart introduced Alfson to Anderson. They had some conversation, part of which Hart overheard and reports as follows:

"Mr. Alfson told Mr. Anderson, as I recall, he could annex his land and other land in with this other lease set-up, I believe that's the word he used, annex."

The defendant F. R. Anderson testified that after Alfson had been introduced he wanted to know why he hadn't been asked to the meeting at Corky's. Anderson explained to him that he had started out with a certain acreage in mind which did not include Judson Township. Alfson said he would like to get in and Anderson told him that he would consider it and see if he could annex more acreage. Anderson's testimony concerning the conversation with Alfson is further corroborated by the testimony of the witness Brooks, an attorney for Anderson who was present during the conversation.

The trial court who had the opportunity to hear and observe the witnesses found that the plaintiff was not induced by fraud or misconduct of the defendant to sign the option agreement. The trial court's finding is entitled to appreciable weight. After careful review of the evidence we agree with the trial court.

■ A further dispute arises with respect to the consideration for the agreement. Brownrigg says he paid Alfson $1. Alfson denies this and his son states that he saw no money paid. On the other hand it appears that Anderson had instructed Brownrigg to pay $1 to the signers of the agreement and in some instances Anderson paid the money himself. The option agreement which Alfson signed recites a consideration "of one dollar, receipt of which is hereby acknowledged," in favor of the defendant. Alfson's written receipt, fortified by the positive testimony of Brownrigg that he actually paid the money, prevails over Alfson's denial of its receipt. The question of the payment of consideration is really immaterial for as will later appear the offer contained in the option agreement was unconditionally accepted within the time prescribed therein and no attempt was made to withdraw it before acceptance. Beiseker v. Amberson, 17 N.D. 215, 116 N.W. 94; Frank v. Stratford-Handcock, 13 Wyo. 37, 77 P. 134, 67 L.R.A. 571, 110 Am.St.Rep. 963.

The instrument captioned "Option to Lease For Oil and Gas" recites that the signers being the owners of the respective parcels of real property whose detailed de-

scriptions are set forth following the signatures, in consideration of the execution of the agreement by other signers and in consideration of the payment to each of them by F. R. Anderson of the sum of $1, the receipt of which is acknowledged, agree with each other and with Anderson as follows:

"1. Each person who, by the execution of this agreement, shall become a party hereto, agrees forthwith to execute, as lessor, and place in escrow in the manner hereinafter provided, an oil and gas lease or leases in favor of F. R. Anderson as lessee, in the form and upon the terms and conditions set forth in one or more of the drafts of lease attached hereto, * * *.

"3. The said Oil and Gas Leases, upon execution by the undersigned, shall be placed in escrow with American State Bank of Williston, North Dakota, with instructions to deliver the same to the Lessee upon condition that, upon delivery to the Lessee, the severally specified rentals for the first rental period as provided in the said Oil and Gas Leases, shall be paid to the respective Lessors.

"4. This option may be exercised by the said F. R. Anderson as to all or any part of the lands affected hereby at any time within 120 days from the date hereof by payment made to the several parties signatory hereto, as provided in paragraph 3 hereof; provided however, that no geophysical survey shall have been made or caused to be made by the said F. R. Anderson of any of the areas affected hereby prior to the exercise by him of this option.

"In witness whereof, the undersigned have executed this Agreement as of the 11th day of June, 1951."

Each of the printed forms of lease attached to the agreement contains the following:

"Lessee may at any time execute and deliver to Lessor or place of record, a release or releases covering any portion or portions of the above described premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered, and thereafter the rentals payable hereunder shall be reduced in the proportion that the acreage covered hereon is reduced by said release or releases."

At the bottom of each lease form there has been added in typewriting the following:

"Lessee agrees that, in releasing any portion or portions less than all of the lands demised by this lease, the parcels to be released will be selected on the basis of the best geological and technical information available, and, so far as consistent therewith, in parcels which shall be contiguous and not on the basis of arbitrary 'checker boarding.'"

On August 8, F. R. Anderson executed before a notary public a "Demand For Performance Of Contract" addressed to Alfred Alfson as follows:

"Reference is hereby made to that certain *Option to Lease for Oil and Gas,* heretofore executed by you as of the 11th day of June, 1951, wherein and whereby you agreed forthwith to execute and place in escrow with American State Bank of Williston, North Dakota, an Oil and Gas Lease, in the form and upon the terms and conditions therein set forth, covering and demising to the undersigned all real property belonging to you and situated in the County of Williams, State of North Dakota and further described as 'approximately 1960 acres in 154/102 in Judson Township'.

"Please take notice that the undersigned has elected and does hereby elect to accept your offer to execute the said Oil and Gas Lease; and *Demand is hereby made* that you forth-

with execute such Oil and Gas Lease and place the same in escrow with American State Bank of Williston, North Dakota for delivery to the undersigned, as in the said *Option to Lease for Oil and Gas* provided.

"You are further advised that the undersigned has deposited with the said American State Bank of Williston the amount of the rental for the first rental period provided in such Oil and Gas Lease with instructions to pay the same to you upon deposit in the said escrow of your said Oil and Gas Lease, as in the said *Option to Lease for Oil and Gas* provided."

This demand was served on Alfson. by the sheriff of Williams County on August 10, 1951.

The evidence shows that Anderson had previously sent letters to the people who had signed the option agreement advising them that he exercised the option and requesting them to execute and deposit their leases in the American State Bank. Anderson had an account in that bank and wrote checks on his account for the amounts of the rental for the first rental period in favor of the persons on whom he made demand and left these checks with an employee of the bank to be delivered to the lessors upon deposit of their executed leases. He later withdrew the checks that had not been delivered and made arrangements with the bank to take care of the payments for the remaining leases by charging his account.

■ An option is not a contract. It is a mere offer on the part of the optionor and does not become a binding contract until it has been accepted by the optionee within the time and upon the terms and conditions provided in the option. Horgan v. Russell, 24 N.D. 490, 140 N.W. 99, 43 L.R.A.,N.S., 1150; Larson v. Wood, 75 N.D. 9, 25 N.W.2d 100; Kern v. Kelner, 75 N.D. 292, 27 N.W.2d 567; Larson v. Cole, 76 N.D. 32, 33 N.W.2d 325; State v. Crum,

70 N.D. 177, 292 N.W. 392; Hultberg v. City of Garrison, 79 N.D. 356, 56 N.W. 2d 319.

An option is but an offer and "Before an acceptance of an offer becomes a binding contract, the acceptance must be unconditional, and must accept the offer without modification or the imposition of new terms." Beiseker v. Amberson, 17 N.D. 215, 116 N.W. 94. This quotation is approved in Horgan v. Russell, 24 N.D. 490, 140 N.W. 99, 43 L.R.A.,N.S., 1150.

■ The plaintiffs argue with great insistence that exercise of the option could not be made without payment or tender of payment to the signatories and that the arrangement that Anderson made with the bank to pay the lessors when the leases were presented does not comply with the condition in the option. This is an extremely technical position not justified by the facts or the terms of the option agreement.

"In determining the meaning of provisions of an option with respect to notice of acceptance, a court should ascertain the intent of the parties in the light of the language used and the surrounding circumstances." 55 Am.Jur., Vendor and Purchaser, Section 38. Citing Northern Illinois Coal Corp. v. Cryder, 361 Ill. 274, 197 N.E. 750, 101 A.L.R. 1420.

A further reference to the terms of the option agreement heretofore quoted discloses that section 3 provides that the leases, upon execution by the optionors, were to be placed in escrow in the American State Bank

"with instructions to deliver the same to the Lessee upon condition that, upon delivery to the Lessee, the severally specified rentals for the first rental period as provided in the said Oil and Gas Leases, shall be paid to the respective Lessors."

Plaintiffs' argument is based upon the provision in section 4 that the option might be exercised by Anderson

> "at any time within 120 days from the date hereof by payment made to the several parties signatory hereto, as provided in paragraph 3 hereof; * * *."

When the provisions of section 3 and section 4 are considered together it is clear to us that payment was not intended to be made directly by Anderson to the lessors but was to be made through the bank upon deposit of the executed leases. Alfred Alfson failed to execute and deposit his lease as he agreed to do. Anderson nevertheless made arrangements with the bank to pay the specified rentals when and if the leases were executed and presented. Anderson's demand for performance advised Alfson of this arrangement as part of the notice of acceptance of the option. The failure of Alfson to receive the rental was wholly due to his failure to execute and deposit the lease as he had agreed to do. We therefore hold that the option was effectively accepted which resulted in a contract whereby Alfred Alfson agreed to execute a lease to Anderson as lessee in the form of those attached to and made a part of the option agreement.

Up to this point we have determined that the plaintiff Alfred Alfson, for a valuable consideration, executed and delivered to the defendant F. R. Anderson an option for an oil and gas lease which was unconditionally accepted and that by such acceptance the option was converted into a contract to execute an oil and gas lease. There now remains to be determined what relief, if any, should be granted to the respective parties in this action. We will first consider the defendant's counterclaim and demand for specific performance.

An action to quiet title is essentially an equitable action. Axt v. Bank of America, 72 N.D. 600, 10 N.W.2d 430; Northwestern Mutual Savings & Loan Ass'n v. Hanson, 72 N.D. 629, 10 N.W.2d 599; Neset v. Rudman, N.D., 74 N.W.2d 826. Specific performance is an equitable remedy governed by equitable principles. Muhlhauser v. Becker, 74 N.D. 103, 20 N.W.2d 353; Bates v. Smith, 48 S.D. 602, 205 N.W. 661; 49 Am.Jur., Specific Performance, Section 6; 81 C.J.S., Specific Performance, § 1b.

The plaintiffs argue that the option agreement, even if converted into a contract by the defendant's acceptance thereof, lacks mutuality and therefore may not be made the subject of a decree of specific performance. They point to Section 32-0408, NDRC 1943 which provides:

> "Neither party to an obligation can be compelled specifically to perform it, unless the other party thereto has performed, or is compelled (compellable) specifically to perform, everything to which the former is entitled under the same obligation, either completely or nearly so, together with full compensation for any want of entire performance."

The option agreement, which by its acceptance by the defendant Anderson became a contract for the execution of an oil and gas lease, had attached to it the form of lease which was to be executed. This lease provided:

> "It is agreed that this lease shall remain in full force for a term of Ten years from this date, and as long thereafter as oil or gas, or either of them, is produced from said land by the lessees, or the premises are being developed or operated."

Such a lease when executed vests in the lessee an interest in real estate. Corbett v. La Bere, N.D., 68 N.W.2d 211; Ulrich v. Amerada Petroleum Corp., N.D., 66 N.W.2d 397; Petroleum Exchange v. Poynter, N.D., 64 N.W.2d 718.

It follows that Alfred Alfson by making a contract to execute an oil and gas lease to

Anderson made a contract to convey to Anderson by a lease an interest in real estate.

A contract for the sale of real estate ordinarily imports mutuality. The vendor may be compelled by specific performance to convey according to the terms and conditions provided in the contract. On the other hand, the vendor may compel the vendee to perform specifically even though his performance consists only in payment of the purchase price. Beddow v. Flage, 22 N.D. 53, 132 N.W. 637; Jones v. Tschetter, 46 S.D. 520, 194 N.W. 839; 49 Am.Jur., Specific Performance, Section 94; 81 C.J.S., Specific Performance, § 25. The same equitable principles that apply between vendor and vendee of a contract for the sale of land are applicable to a contract to give a gas and oil lease which when executed would vest in the lessee an interest in real estate. In the contract under consideration mutuality exists between the prospective lessor and lessee with respect to their obligations, on the one hand, to execute the lease and, on the other, to pay the rental provided to be paid for the first rental period and unless the contract contains some other factor that would destroy mutuality it may be specifically enforced. Vanzandt v. Heilman, 54 N.M. 97, 214 P.2d 864, 22 A.L.R.2d 497.

■ The plaintiffs argue that specific performance of a contract to give an oil and gas lease will not be compelled where the lease contracted for may be terminated at will by the lessee because of lack of mutuality. The proposed lease form contains such a surrender clause.

Many authorities hold that oil and gas leases which give the lessee the right to surrender the lease at any time cannot be enforced by specific performance. Pittsburg Vitrified P. & B. B. Co. v. Bailey, 76 Kan. 42, 90 P. 803, 12 L.R.A.,N.S., 745; Templeton v. Williard, 83 Mont. 317, 272 P. 522; Kolachny v. Galbreath, 26 Okl. 772, 110 P. 902, 38 L.R.A.,N.S., 451; Hill Oil & Gas Co. v. White, 53 Okl. 748, 157 P. 710;

Melton v. Cherokee Oil & Gas Co., 67 Okl. 247, 170 P. 691; Lima Oil & Gas Co. v. Pritchard, 92 Okl. 113, 218 P. 863; Eclipse Oil Co. v. South Penn Oil Co., 47 W.Va. 84, 34 S.E. 923. In this case, however, we are not dealing with the enforceability of a lease, but with the question of whether a contract to execute a lease may be specifically enforced when the lease for which it provides is not specifically enforceable because it lacks mutuality of remedy. Lack of mutuality of remedy in the proposed lease is not always fatal to the right to specifically enforce the contract. St Joseph Hydraulic Co. v. Globe Tissue-Paper Co., 156 Ind. 665, 59 N.E. 995.

California has a statute identical with our Section 32–0408, NDRC 1943. The district court of appeals has in two cases held that an oil and gas lease which gave the lessee the right to surrender the lease at any time lacked mutuality and that a contract to execute such a lease was not specifically enforceable. Dabney v. Key, 57 Cal.App. 762, 207 P. 921; George v. Weston, 26 Cal.App.2d 256, 79 P.2d 110.

Gavina v. Smith, Cal.App., 148 P.2d 890, was an action to quiet title. Relying on the two cases last cited the district court of appeals accepted the proposition that a contract to make a lease where the proposed lease contained a surrender clause was not specifically enforceable and then went on to hold that the contract then under consideration not being specifically enforceable was not a defense in an action to quiet title. That case was appealed to the supreme court and in Gavina v. Smith, 25 Cal. 2d 501, 154 P.2d 681, 683, it was held that the contract in question itself constituted a lease which obviated the question of specific performance of a contract to make a lease. The court then went on to say:

"It is settled in this state that an oil lease like the one in the present case creates a profit a prendre and vests in the lessee an estate in real property * * * and that the owner may not quiet his title against such a vested in-

terest. * * * It is immaterial whether the defendant could get a decree for specific performance if he sought it, for he has a legal interest in the property and legal remedies to enforce it independently of the remedy of specific performance."

Thus the court denied the plaintiff's right to quiet title.

We have reached the conclusion that the rule of the California cases of Dabney v. Key and George v. Weston, supra, if sound, has no application here. We have already pointed out that the contract to execute the oil and gas lease which resulted from the acceptance of the option agreement by Anderson was mutual in that it obligated the lessor to make the lease and obligated the lessee to pay the rental for the first rental period. Under the facts here presented that obligation could not be avoided by the lessee by exercising any right under the surrender clause. The obligation to pay the first rental was made definite and binding by the terms of his acceptance of the option. The acceptance imposed on Anderson a definite specifically enforceable liability to pay the rental for the first period from which payment the surrender clause in the lease could afford him no relief. The provision for the payment of the first year's rental contained in the option agreement is a dual consideration which in addition to being an obligation under the proposed lease is a binding condition of the acceptance of the option. The surrender clause in the lease does not affect the lessor's right to receive the first rental which has been tendered in compliance with the conditions of the option. The surrender clause may be used by the lessee to release him from his obligations under the lease but it affords him no relief from the conditions of the option agreement to which he bound himself by his acceptance and tender. We can see reason for the rule that a contract to make a lease which can be terminated forthwith without obligation on the part of the lessee lacks mutuality of obligation and remedy because the decree of the court could be set to nought by a termination of the lease on the part of the lessee if specific performance were decreed against him. But where, as in this case, the contract binds the prospective lessee to pay a substantial sum on execution and delivery of the lease irrespective of the right of termination, the contract does not lack mutuality of either obligation or remedy and the court may specifically enforce execution of the lease by the lessor and payment by the lessee or either.

We further point out that Anderson has performed the contract insofar as he has been permitted to perform by Alfson. The failure of Alfson to receive the rent for the first rental period is due solely to his failure to execute and deposit the lease as he agreed to do. He cannot prevent performance and then use lack of performance as a basis for invoking Section 32-0408, NDRC 1943 as a bar to specific performance. Anderson had, and still has, funds deposited in or a credit with the American State Bank for the payment of the rental for the first rental period in full compliance with the contract for the execution of the lease. This may not be payment in the technical sense that Alfson has not received the money, but it is the full equivalent of complete performance of the contract on Anderson's part. The contract is executed on the part of Anderson and lacks no mutuality which would interfere with his right to specific performance. Bull Creek Oil & Gas Development v. Bethel, 127 Mont. 222, 258 P.2d 960; Gosnell v. Lloyd, 215 Cal. 244, 10 P.2d 45; Yale Investment Co. v. Williams, 105 Fla. 414, 141 So. 308; 81 C.J.S., Specific Performance, § 11f. The rule of mutuality either as a rule of equity or under our statute has no application to contracts that have been fully performed by one seeking specific performance. 49 Am.Jur., Specific Performance, Section 38; 81 C.J.S., Specific Performance, § 11f.

The plaintiffs further urge that the deposit in and arrangement with the bank

made by Anderson for the payment of rental for the first rental period was not a tender because no deposit was made in the name of Alfson. They cite Sections 9–1224 and 9–1225, NDRC 1943 which deal with a deposit in the name of the creditor for the purpose of extinguishing an obligation. Those statutes are not applicable here. They do not apply to the tender that is a necessary precedent to the right to maintain an action in specific performance for the conveyance or leasing of real estate.

> "The word 'tender' as used in such a connection does not mean the same kind of offer as when it is used in reference to the payment of or offer to pay an ordinary debt due in money. Where the promise to pay is conditioned upon concurrent performance by the vendor, an offer to pay, on condition that the vendor concurrently perform his part by executing a deed, is a good and sufficient tender where it is coupled with an ability to pay." 55 Am.Jur., Vendor and Purchaser, Section 342.

The plaintiffs argue that the defendant has not acted in good faith or with that diligence required by a court of equity. They would invoke laches on the part of the defendant as a bar to specific performance in his behalf. They cite Raasch v. Goulet, 57 N.D. 674, 223 N.W. 808, in support of this contention. In that case this court denied specific performance to a vendee who had been grossly negligent of his rights and by his conduct had indicated that he had abandoned his contract while the vendor, induced by his action, had entered into obligations inconsistent with the performance of the contract. In that case there had been a delay of approximately ten years. But the opinion discloses that it was more the conduct of the vendee and the inequitable position in which he had placed the vendor rather than the mere passage of time that caused the court to deny specific performance.

■ Laches is an equitable defense to the enforcement of a contract. In Grandin v. Gardiner, N.D., 63 N.W.2d 128, 129, we stated the rule that:

> "Laches does not arise from delay or lapse of time alone. A party against whom laches is sought to be invoked must be actually or presumptively aware of his rights and fail to assert them against a party who has in good faith permitted his position to become so changed that he cannot be restored to his former state."

We affirmed that rule in Wittrock v. Weisz, N.D., 73 N.W.2d 355.

■ In this case the option agreement is dated June 11, 1951. Alfred Alfson was first advised by letter that the defendant had exercised his option and later, on August 10, 1951, a "Demand For Performance Of Contract" which we have heretofore quoted was served upon Alfson and shortly thereafter was recorded in the office of the register of deeds of Williams County. There appears to be no conduct on the part of the defendant that indicates an intention on his part to abandon that demand. The plaintiffs commenced an action to quiet title, the summons being dated July 14, 1953. On October 7, 1953, the defendant served his answer and counterclaim asking specific performance. Laches barring relief under the defendant's counterclaim does not arise from these facts.

The judgment appealed from is affirmed.

BURKE, C. J., and SATHRE, JOHNSON and GRIMSON, JJ., concur.